BS/WMP:MA/CLS/JMK
F. #2016R01012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MARK JOHNSON and
STUART SCOTT,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
CLERK

2016 AUG 16 PM 3:03

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

INDICTMENT

Cr. No. **CR 16 - 457**
(T. 18, U.S.C., §§ 981(a)(1)(C), 1343,
1349, 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

GARAUFIS, J.

KUO, M.J.

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.   The Defendants and the Relevant Entities

1.   From approximately 2010 to 2016, the defendant MARK JOHNSON, a citizen of the United Kingdom and resident of London and New York, was the head of global foreign exchange ("FX") cash trading at HSBC Bank plc, a subsidiary of HSBC Holdings plc (referred to collectively as "HSBC"). JOHNSON supervised HSBC's worldwide FX cash trading business.

2.   From approximately 1997 to 2014, the defendant STUART SCOTT, a citizen of the United Kingdom and resident of London, was an FX trader, and later a supervisor, at HSBC. In or about April 2011, SCOTT became HSBC's head of FX cash trading for Europe, the Middle East and Africa ("EMEA") in London. JOHNSON supervised SCOTT from approximately 2010 to 2014.

3. HSBC was one of the largest banking and financial services institutions in the world, with operations in EMEA, Asia-Pacific and the Americas. HSBC operated a global FX cash trading business. HSBC's three principal FX trading desks were located in New York, London and Hong Kong.

4. Prior to 2011, HSBC provided financial services to an oil and gas exploration company (the "Victim Company"), an entity whose identity is known to the Grand Jury. In December 2011, HSBC executed an FX transaction for the Victim Company in which it converted approximately 3.5 billion U.S. Dollars to British Pounds (the "Victim Company FX Transaction").

## II. Relevant Definitions

5. The "FX market" enabled participants to buy, sell, exchange and speculate on currencies. Participants in the FX market included financial institutions, central banks, hedge funds, investment management firms and corporations.

6. An "FX spot transaction" (sometimes referred to as an "FX transaction") involved the exchange of a given amount of one currency, such as the U.S. Dollar ("USD" or "Dollar"), for the equivalent amount of another currency, such as the British Pound ("GBP" or "Sterling"), at an agreed upon price.

7. A "currency pair" was the relation of two currencies to each other. The first currency of a currency pair was called the "base" currency, and the second currency was called the "quote" currency. For example, one currency pair was GBP/USD, or Sterling/Dollar. In this pair, GBP was the base currency and USD was the quote currency. An order to buy GBP/USD was an order to buy the base currency (GBP) using the quote currency (USD) to pay for the transaction. An order to sell GBP/USD was an order to sell the base currency (GBP) and

to receive the quote currency (USD). For example, GBP/USD 1.5620 meant that one Pound Sterling could be exchanged for 1.5620 Dollars.

8. "Fixes" were benchmark exchange rates. WM/Reuters ("WMR"), a financial services company, published hourly "fix" rates for various currencies. The WMR fix at 4:00 PM London time (the "4 PM fix") was one of the most widely used fixes in the world.

9. "P-books" was a phrase used by HSBC personnel to refer to internal HSBC accounts allocated to individual HSBC traders that allowed those traders to trade in any currency pair. Revenues generated in P-books accrued to the benefit of HSBC and were taken into account for purposes of evaluating each trader's performance, promotion potential and compensation.

III. The Fraudulent Scheme

10. From at least in or about October 2011 and continuing until at least in or about December 2011, the defendants MARK JOHNSON and STUART SCOTT, together with others, participated in a scheme to defraud the Victim Company by:

a. Using information provided in confidence to HSBC by the Victim Company (namely, the details of the Victim Company FX Transaction) to purchase Sterling in advance of the transaction, knowing that the transaction would cause the price of Sterling to increase, thereby generating substantial trading profits for HSBC and the defendants (a scheme that is commonly referred to as "front-running") in breach of HSBC's duty of trust and confidence to the Victim Company;

b. Causing the Victim Company FX Transaction to be executed in a manner designed to cause the price of Sterling to spike (commonly referred to as "ramping") to the benefit of HSBC and the defendants, and at the expense of the Victim Company, despite

3

HSBC's representations to execute the transaction in the best interests of, and to avoid adverse market impact to, the Victim Company; and

          c.      Making, and causing to be made, material misrepresentations and omissions to the Victim Company to further the scheme by, among other things, concealing HSBC's role in the spike in the price of Sterling.

    A.    <u>The Bidding Process</u>

    11.    In approximately 2010, the Victim Company entered into an agreement with another company to sell part of its ownership interest in an Indian subsidiary for approximately $3.5 billion. Execution of the sale was dependent upon regulatory approval in India. If the sale was approved, the Victim Company planned to convert approximately $3.5 billion in sale proceeds into Sterling, which it then intended to distribute to its shareholders. In approximately 2011, the Victim Company, assisted by an advisory group (the "Advisor"), an entity whose identity is known to the Grand Jury, asked approximately ten banks, including HSBC, to bid on the right to execute the Victim Company FX Transaction.

    12.    Prior to providing the banks with the details of the Victim Company FX Transaction in a Request for Proposal ("RFP"), the Victim Company and the Advisor required the banks to enter into a confidentiality agreement that protected the Victim Company's confidential information relating to the Victim Company FX Transaction. In the confidentiality agreement HSBC executed, HSBC agreed to "keep the Confidential Information strictly confidential and not to disclose, sell, trade, publish or otherwise dispose of such Confidential Information . . . or discuss the same with, any third party, other than such duly authorised employees, officers and directors of [HSBC], as are strictly necessary to evaluate the Confidential Information." "Confidential Information" was defined to include "commercial,

4

contractual, corporate and financial information" provided by the Victim Company and specifically included the RFP information.

13. HSBC further agreed to "use the Confidential Information solely for the purposes for which it is provided, details of which are set out in the RFP." After the confidentiality agreement was fully executed, the Victim Company and the Advisor provided HSBC with the RFP, which contained Confidential Information about the Victim Company FX Transaction.

14. The RFP provided in relevant part that:

> The RFP contains confidential information and has been delivered to relationship banks for information only and on the express understanding that (a) they shall keep the information included in the RFP confidential (except to the extent that such information is in the public domain), and (b) use it only for the purpose set out below. Save as specifically agreed in writing by [Victim Company], the RFP must not be copied, reproduced, disclosed, distributed or passed, in whole or in part, to any other person.
>
> The purpose of the RFP is to assist the relationship banks in their analysis of the proposed currency exchange transaction. The RFP should not be used for any other purpose without the prior written consent of [Victim Company].

15. Employees of HSBC who were given access to the Confidential Information were made "insiders" by HSBC to the Victim Company FX Transaction. In or about October 2011, the defendant MARK JOHNSON became an "insider" to the Victim Company FX Transaction. In or about November 2011, the defendant STUART SCOTT also became an "insider" to the Victim Company FX Transaction. As "insiders," JOHNSON and SCOTT knew they had an obligation not to misuse the Confidential Information, including by front-running.

16. After receiving the RFP, HSBC employees sought to win the bid for the Victim Company FX Transaction. HSBC's pitch materials listed the defendant MARK

5

JOHNSON as a member of the HSBC team for the transaction, along with the head of corporate structuring for EMEA at that time ("Salesperson 1"), an individual whose identity is known to the Grand Jury.

17. In the pitch materials, HSBC employees made representations to the Victim Company and the Advisor about confidentiality and HSBC's ability to execute the Victim Company FX Transaction at the best possible price and with the lowest possible risk of financial loss for the Victim Company. For example, the written HSBC pitch presentation stated:

a. "Time to execute is essentially a choice for the company, as HSBC is able to provide one quote for the full amount or even drip feed the market in utmost confidential nature so as to ensure there are no sudden FX moves against the company;"

b. "HSBC would work with you to ensure best execution [of the Victim Company FX Transaction] during the day"; and

c. "[I]t is in the interest of the company to manage the process jointly with HSBC in case of undue market volatility. We would like to execute this in the best interest of the company . . . ."

B. HSBC Selected to Handle the Victim Company FX Transaction

18. On or about October 18, 2011, the Victim Company, through its Advisor, notified HSBC that it had been selected to handle the Victim Company FX Transaction "because they are the best and [had] acknowledged that they now have the pressure to deliver best execution."

19. Despite knowing that HSBC had represented to the Victim Company that it would execute the transaction in a manner consistent with the Victim Company's best interests

6

and keep the Victim Company FX Transaction confidential and in breach of HSBC's duty of trust and confidence to the Victim Company, the defendants MARK JOHNSON and STUART SCOTT devised a scheme to benefit HSBC, and ultimately themselves, at the Victim Company's expense by (a) using their insider knowledge of the details of the Victim Company FX Transaction to front-run that transaction, and (b) ramping the price of Sterling/Dollar to the benefit of HSBC, and to the detriment of the Victim Company.

20. In a telephone call with the Victim Company and the Advisor on or about November 28, 2011, the defendants MARK JOHNSON and STUART SCOTT were notified that the Victim Company FX Transaction might occur soon.

21. On that same day, on or about November 28, 2011, in preparation for a call among the Victim Company, the Advisor and HSBC employees, Salesperson 1 gave advice about ramping the market in a manner that would not raise suspicions of the Victim Company or the Advisor. Salesperson 1 stated to the defendant STUART SCOTT during a telephone call that, among other things, the Victim Company viewed the Advisor "as an agent in between who will be closely monitoring it when we are doing [the Victim Company FX Transaction], . . . . So we don't want . . . to push the market too much high[er] . . . and at the same time we do want to make money on this."

22. On or about November 30, 2011, the defendant MARK JOHNSON made a purchase of Sterling in exchange for Euros, which was booked in his P-book. JOHNSON held the Sterling he purchased until the day of the Victim Company FX Transaction, when he sold the currency for a profit to HSBC.

23. On or about December 5, 2011, the defendants MARK JOHNSON and STUART SCOTT received additional information regarding the timing of the Victim Company

7

FX Transaction. Specifically, a news article was circulated to them reporting that the underlying sale by the Victim Company of its Indian subsidiary had received regulatory approval.

24. On that same day, on or about December 5, 2011, the defendant MARK JOHNSON traveled to New York. While in New York, JOHNSON directed an FX trader in HSBC's New York office to purchase Sterling in exchange for Dollars, which JOHNSON later sold for a profit to HSBC on the day of the Victim Company FX Transaction. The next day, on or about December 6, 2011, the defendant STUART SCOTT purchased Sterling in exchange for Euros, which SCOTT later sold for a profit to HSBC on the day of the Victim Company FX Transaction.

C. The Execution of the Victim Company FX Transaction

25. On or about December 7, 2011, the Victim Company contacted HSBC about executing the Victim Company FX Transaction on that day. Salesperson 1 arranged for a call at approximately 1:35 PM London time between the Victim Company, the Advisor, Salesperson 1 and the defendants MARK JOHNSON and STUART SCOTT to discuss whether the Victim Company FX Transaction should be executed at the 3 PM fix or the 4 PM fix. Both SCOTT and JOHNSON knew that it was advantageous to them and HSBC, and disadvantageous to the Victim Company, to execute the Victim Company FX Transaction at the 3 PM fix because there was less liquidity at the 3 PM fix and currency prices at that earlier time were easier to manipulate than prices at the 4 PM fix.

26. During the December 7, 2011 call, the defendant STUART SCOTT falsely and fraudulently suggested to the Victim Company that the 3 PM fix had more liquidity than the 4 PM fix. When confronted by the Advisor about that assertion, SCOTT falsely and fraudulently stated that the fixes were the same in terms of liquidity. SCOTT then stated there was more

trading volatility at the 4 PM fix and the defendant MARK JOHNSON stated that he "personally would recommend" the 3 PM fix "so there's an element of surprise." SCOTT further stated that: "That's an excellent point actually, yeah. Because people do look for that, for the significant flows to happen at 4 o'clock and once they get a smell of that or a smell of significant flow going through, they will try to jump in front and start to muck around in the markets." The Victim Company followed the HSBC recommendation to execute the Victim Company FX Transaction at the 3 PM fix.

27. The defendants MARK JOHNSON and STUART SCOTT, anticipating that the execution of the Victim Company FX Transaction by HSBC would drive up the price of Sterling/Dollar, quickly orchestrated front-running purchases of Sterling for HSBC. Specifically, within minutes of the December 7, 2011 telephone call with the Victim Company, SCOTT directed the purchasing of Sterling/Dollar in his P-book. JOHNSON and SCOTT also caused other FX traders at HSBC in both London and New York to purchase Sterling prior to the Victim Company FX Transaction in their P-books.

28. On or about December 7, 2011, the Victim Company placed its order with HSBC to buy approximately 2.25 billion Sterling (equivalent to selling approximately $3.5 billion) in two tranches prior to the 3 PM fix—at approximately 1:51 PM and 2:28 PM London time. JOHNSON and SCOTT were in communication with each other concerning the execution of the Victim Company FX Transaction. For example, during a consensually recorded telephone call at approximately 2:27 PM London time, JOHNSON commented to SCOTT, "Seems that they're starting to bite," in reference to the Victim Company's orders. In response, SCOTT stated, "full amount" (indicating that the Victim Company had authorized the full order of 2.25 billion Sterling). JOHNSON then responded, "No, you're kidding?" SCOTT then re-confirmed

9

that the Victim Company had indeed authorized the full purchase, to which JOHNSON replied: "Ohhhh, f***ing Christmas."

29.   During a consensually recorded telephone call at approximately 2:54 PM London time, the defendants MARK JOHNSON and STUART SCOTT discussed the Victim Company FX Transaction again. During that call, JOHNSON and SCOTT discussed how high they could "ramp" the price of Sterling/Dollar before the Victim Company would "squeal." SCOTT also provided a trader ("Trader 1"), an individual whose identity is known to the Grand Jury, with guidance about how high to push the price of Sterling/Dollar prior to the 3 PM fix, when the Victim Company FX Transaction would be priced. HSBC "ramped" the price Sterling/Dollar by aggressively trading before and during the fix in a manner designed to increase the price of Sterling/Dollar. As a result, the price of Sterling/Dollar spiked around the 3 PM fix. Indeed, in the 30 seconds before and 30 seconds after 3:00 PM London time, the price of Sterling/Dollar reached a market high for the day, allowing JOHNSON, SCOTT and other FX traders at HSBC to generate significant profits in their P-books from their prior Sterling purchases by selling that Sterling at the higher prices generated by HSBC. Neither JOHNSON nor SCOTT disclosed their own P-book trades or the P-book trades of other FX traders at HSBC in Sterling to the Victim Company.

30.   On or about December 7, 2011, the Victim Company and the Advisor monitored the price of Sterling in the FX market in anticipation of the Victim Company FX Transaction. When the Victim Company and the Advisor observed upward movement in the price of Sterling between 2:00 PM and 3:00 PM London time, they questioned Salesperson 1 about these price movements. At approximately 2:45 PM London time, Salesperson 1 told the defendants MARK JOHNSON and STUART SCOTT that the Victim Company and the Advisor

were calling at "every uptick" in reference to the price of Sterling. Finally, just after 3:00 PM London time, Salesperson 1 told JOHNSON and SCOTT that he had told the Victim Company and the Advisor that a "[R]ussian name" was buying at the same time as the Victim Company. Accordingly, JOHNSON and SCOTT knew that the Victim Company and the Advisor had been falsely and fraudulently assured that the upward price movement in Sterling/Dollar was attributable to a "[R]ussian name."

31. Soon after 3:00 PM London time on or about December 7, 2011, the defendants MARK JOHNSON and STUART SCOTT, together with others from HSBC, discussed the Victim Company FX Transaction with the Victim Company and the Advisor. JOHNSON and SCOTT, among others, made and caused to be made misrepresentations to the Victim Company and the Advisor to conceal their misconduct with respect to, among other things, the cause of the upward price movement in Sterling/Dollar prior to the 3 PM fix and the timing and manner in which HSBC handled the Victim Company FX Transaction.

32. For example, the defendant STUART SCOTT represented to the Victim Company and the Advisor that the Victim Company FX Transaction went "okay" despite an "initial jump" in the price, which he falsely and fraudulently attributed to trading by a Russian bank, in reference to the "[R]ussian name" that Salesperson 1 had previously discussed with the Victim Company and the Advisor. Contrary to SCOTT's representation and as SCOTT well knew, HSBC was responsible for the increase in the price of Sterling/Dollar prior to the Victim Company FX Transaction, not a Russian bank.

33. Additionally, the defendant STUART SCOTT falsely and fraudulently stated to the Victim Company and the Advisor that HSBC began "taking action" in the FX market approximately five minutes prior to the 3 PM fix. Contrary to SCOTT's assertion, and as

11

SCOTT well knew, HSBC had purposefully been exerting upward pressure through its transactions in the Sterling/Dollar market well prior to 2:55 PM London time.

34. In the days immediately following this discussion, the Victim Company undertook to settle the Victim Company FX Transaction with HSBC, during which process wires sent in furtherance of the scheme were transmitted from the Eastern District of New York to outside the State of New York. Specifically, the Victim Company settled the Victim Company FX Transaction by transferring U.S. dollars through a U.S. financial institution ("Financial Institution A"), an entity whose identity is known to the Grand Jury, to HSBC. Financial Institution A only accepted and released these funds to HSBC following customary checks and approvals by personnel in Financial Institution A's offices in Brooklyn, New York. Financial Institution A personnel performed these checks and obtained the requisite approvals from Brooklyn by electronically accessing Financial Institution A's mainframe, which was located outside the State of New York. Each check and approval occurred through an interstate wire communication between Brooklyn, where Financial Institution A personnel were located at the time, and Financial Institution A's mainframe, which was located outside the State of New York.

35. In total, HSBC gained approximately $5,000,000 from its execution of the Victim Company FX Transaction and approximately $3,000,000 from the P-book trades of the London and New York FX traders.

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

36. The allegations set forth in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

37. In or about and between October 2011 and December 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

12

defendants MARK JOHNSON and STUART SCOTT, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWO THROUGH ELEVEN
(Wire Fraud)

38. The allegations set forth in paragraphs one through thirty-five are realleged and incorporated as though fully set forth in this paragraph.

39. In or about and between October 2011 and December 2011, both dates being approximate and inclusive, within the Southern District of New York and the Eastern District of New York, the defendants MARK JOHNSON and STUART SCOTT, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company by means of materially false and fraudulent pretenses, representations and promises.

40. On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendants MARK JOHNSON and STUART SCOTT, together with others, transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| Count | District | On or About Date | Underlying Fund Transfer | Description of Wire |
|---|---|---|---|---|
| TWO | SDNY | 12/7/2011 | N/A | Telephone call at approximately 1:35 PM London time involving JOHNSON in New York, New York, and others outside the State of New York in which JOHNSON, SCOTT, and others discussed whether the Victim Company FX Transaction should be executed at the 3 PM fix or the 4 PM fix. |
| THREE | SDNY | 12/7/2011 | N/A | Telephone call at approximately 2:27 PM London time involving JOHNSON in New York, New York, and SCOTT outside the State of New York in which JOHNSON and SCOTT discussed that the Victim Company had given HSBC the full order. |
| FOUR | SDNY | 12/7/2011 | N/A | Telephone call at approximately 2:54 PM London time involving JOHNSON in New York, New York, and SCOTT outside the State of New York in which JOHNSON and SCOTT discussed how high they could "ramp" the price of Sterling/Dollar before the Victim Company would "squeal." |
| FIVE | SDNY | 12/7/2011 | N/A | Email involving JOHNSON in New York, New York, and others outside the State of New York in which JOHNSON and others discussed that the Victim Company/Advisor was calling at "every uptick" in reference to the price of Sterling and was told that a "[R]ussian name" was buying at the same time as the Victim Company. |
| SIX | SDNY | 12/7/2011 | N/A | Telephone call at approximately 3:15 PM London time involving JOHNSON in New York, New York, and others outside the State of New York in which JOHNSON, SCOTT and others discussed the Victim Company FX Transaction. |

| Count | District | On or About Date | Underlying Fund Transfer | Description of Wire |
|---|---|---|---|---|
| SEVEN | EDNY | 12/7/2011 | Incoming fund transfer of approximately $3.3896 billion to Victim Company's Financial Institution A account. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe at Location A outside of New York approving underlying fund transfer. |
| EIGHT | EDNY | 12/8/2011 | Outgoing fund transfer of approximately $286.5 million from Victim Company's Financial Institution A account to HSBC. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe outside the State of New York approving underlying fund transfer. |
| NINE | EDNY | 12/8/2011 | Outgoing fund transfer of approximately $370 million from Victim Company's Financial Institution A account to HSBC. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe outside of the State of New York approving underlying fund transfer. |
| TEN | EDNY | 12/8/2011 | Outgoing fund transfer of approximately $345 million from Victim Company's Financial Institution A account to HSBC. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe outside of the State of New York approving underlying fund transfer. |
| ELEVEN | EDNY | 12/8/2011 | Outgoing fund transfer of approximately $390 million from Victim Company's Financial Institution A account to HSBC. | Wire initiated by Financial Institution A from Brooklyn, New York, to Financial Institution A's mainframe outside the State of New York approving underlying fund transfer. |

(Title 18, United States Code, Section 1343, 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH ELEVEN

41.   The United States hereby gives notice to the defendants MARK JOHNSON and STUART SCOTT that, upon their conviction of any of the offenses charged in Counts One through Eleven of this Indictment, the government will seek forfeiture in accordance

with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any persons convicted of such offenses to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

    42.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred or sold to, or deposited with, a third party;

    (c)  has been placed beyond the jurisdiction of the court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be

subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United

Case 1:16-cr-00457-NGG Document 9 Filed 08/16/16 Page 17 of 17 PageID #: 42

States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(c); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK



17