UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 16-CR-457 (NGG) |
| | : | |
| | : | Date of Service: September 6, 2017 |
| -against- | : | |
| | : | |
| MARK JOHNSON and | : | |
| STUART SCOTT, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE*
## TO LIMIT EXPERT TESTIMONY

LANKLER SIFFERT & WOHL LLP
Frank H. Wohl
500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399 (telephone)
(212) 764-3701 (facsimile)
fwohl@lswlaw.com

*Attorneys for Mark Johnson*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

A.  Dr. Overdahl's Testimony Is Highly Relevant and Admissible. ........................................ 2

B.  Mr. Rodgers' Testimony that the Price Paid by Cairn Was
    "Commercially Reasonable" Is Relevant and Admissible Expert Testimony.................... 8

C.  Testimony About the Absence of Regulations Prohibiting Mr. Johnson's
    Conduct Is Highly Relevant and Proper. ....................................................................... 12

D.  Mr. Rodgers' Testimony about the Possible Origins of a Rumor and
    the Use of Code Words in the Industry Is Relevant and Admissible................................ 15

    1. Russian Counterparties ................................................................................................ 15

    2. Use of Code Words...................................................................................................... 17

E.  Mr. Rodgers' Testimony about FX Desks Is Relevant and Admissible........................... 19

CONCLUSION..................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
No. 99 Civ. 1725, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) .................................... 4

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................................. 7, 19

*United States Commodity Futures Trading Comm'n v. Wilson*,
No. 13 Civ. 7884, 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ..................................... 3, 4, 6

*United States v. Brandt*,
196 F.2d 653 (2d Cir. 1952) ............................................................................................ *passim*

*United States v. Certified Envtl. Servs., Inc.*,
753 F.3d 72 (2d Cir. 2014) ..................................................................................... 2, 3, 13, 14

*United States v. Collorafi*,
876 F.2d 303 (2d Cir. 1989) .................................................................................................... 2

*United States v. Diallo*,
40 F.3d 32 (2d Cir. 1994) ................................................................................................. *passim*

*United States v. Finazzo*,
No. 10-CR-457 RRM RML, 2013 WL 619571 (E.D.N.Y. Feb. 19, 2013) ............................. 11

*United States v. Hamilton*,
3 F. App'x 7 (2d Cir. 2001) ................................................................................................... 16

*United States v. Heimann*,
705 F.2d 662 (2d Cir. 1983) .................................................................................................. 10

*United States v. Herron*,
No. 10-CR-0615 NGG, 2014 WL 1871909 (E.D.N.Y. May 8, 2014) ..................................... 20

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015) ............................................................................................ *passim*

*United States v. Nouri*,
711 F.3d 129 (2d Cir. 2013) .................................................................................................. 14

*United States v. Novak*,
443 F.3d 150 (2d Cir. 2006) .................................................................................................... 9

*United States v. Onumonu,*
   967 F.2d 782 (2d Cir. 1992) ................................................................ *passim*

*United States v. Ortiz,*
   112 F.3d 506 (2d Cir. 1997) ................................................................ 14

*United States v. Regent Office Supply Co.,*
   421 F.2d 1174 (2d Cir.1970) .............................................................. 10

*United States v. Starr,*
   816 F.2d 94 (2d Cir. 1987) .................................................................. 9

**Other Authorities**

Federal Rule of Evidence 403 ................................................................ 8

Defendant Mark A. Johnson respectfully submits this memorandum of law in opposition to the government's August 31, 2017 motion to exclude certain categories of expert testimony.

## PRELIMINARY STATEMENT

In July 2016, Mr. Johnson was criminally charged with wire fraud and conspiracy to commit wire fraud, based on alleged "front-running" and "ramping" conduct in the institutional foreign exchange market that had never before been a subject of criminal prosecution. Nor was his alleged conduct prohibited by any regulation, regulatory guidance, or any applicable industry standard. Rather, Mr. Johnson's conduct was entirely consistent with legitimate, standard practice in the institutional foreign exchange market, and he had no reason to believe that his conduct would later be deemed to be improper, let alone criminal. In light of these facts, Mr. Johnson has a substantial defense that he acted in good faith and lacked the requisite willfulness and intent to defraud Cairn.

Through its August 31 motion to preclude categories of expert testimony, the government improperly seeks to gut Mr. Johnson's good-faith defense. The portions of expert testimony that the government seeks to preclude share a common theme: they all are highly probative, and powerfully supportive, of Mr. Johnson's defense that he acted in good faith and lacked the requisite criminal intent and knowledge. With respect to several crucial topics, the government in effect seeks to limit Mr. Johnson's good faith evidence to his own testimony. This effort is grossly improper, contrary to well-established, fundamental principles of law, and must be denied. Mr. Johnson is entitled to present evidence, including expert evidence, corroborating his defense.

Both the Second Circuit and this Court have recognized that "since [good faith] may be only inferentially proven, no events or actions which bear even remotely on its probability

should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have." *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) (citation omitted); *see also United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (same); *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989) (same); *United States v. Johnson*, 16 Cr. 457 (NGG) (E.D.N.Y. Sept. 1, 2017), ECF No. 101 ("Sealed Mem. & Order"), at 30 (same).

Indeed, the Second Circuit has reversed criminal convictions based on the trial courts' exclusion of expert testimony bearing on the defendant's relevant state of mind. *See, e.g.*, *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994); *United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992); *see also Litvak*, 808 F.3d at 190 (concluding that district court exceeded its discretion in precluding expert testimony about the defendant's relationship to the victim and non-expert evidence bearing on good faith); *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 90, 96 (2d Cir. 2014) (district court's exclusion of good-faith evidence was improper and significant because it left the jury "without vital context and corroboration for the defendants' defense of good faith and lack of criminal intent").

The government's unjust and legally defective attempt to strip Mr. Johnson's defense should be denied.

## A. Dr. Overdahl's Testimony Is Highly Relevant and Admissible.

The government first objects to the testimony of Dr. James Overdahl, a former Chief Economist at both the CFTC and the SEC, about the definition of "front-running." This testimony is relevant and proper evidence negating the government's allegations that Mr. Johnson's conduct was commonly known to constitute improper "front-running."

The Indictment alleges that Mr. Johnson participated in a scheme to defraud Cairn by using confidential information about the Cairn transaction "to purchase Sterling in advance of

the transaction, knowing that the transaction would cause the price of Sterling to increase, thereby generating substantial trading profits for HSBC and the defendants (*a scheme that is commonly referred to as 'front-running'*) in breach of HSBC's duty of trust and confidence to the Victim Company . . . ." Indictment ¶ 10(a) (emphasis added). By alleging that Mr. Johnson engaged in a "scheme" that is "commonly referred to as 'front-running,'" the government obviously suggests that Mr. Johnson's purchases of Sterling in advance of the fix were both wrongful, and *commonly known* to be wrongful – an allegation that is highly relevant both to the existence of a scheme and the element of willfulness. Mr. Johnson undoubtedly is entitled to dispute the government's allegations of wrongfulness and willfulness, and to present evidence that his conduct was *not* in fact commonly known as "front-running," but rather was known as perfectly legitimate FX trading and standard execution strategy. Indeed, in ruling on the parties' motions *in limine*, this Court has recognized the relevance of evidence that Mr. Johnson's alleged "front-running" conduct was not prohibited and was common business practice. Sealed Mem. & Order at 31.

To that end, Mr. Johnson is entitled to introduce expert testimony about what industry regulators did and did not understand to be an improper "front-running" scheme. *See, e.g.*, *United States Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016) (Torres, J.) (expert testimony of former Chief economist of CFTC about how "industry actors, such as the CFTC" understood relevant concepts was admissible). Mr. Johnson is not, as the government's arguments would suggest, required simply to accept the government's erroneous allegations that his conduct was commonly known to be improper; nor is he restricted to his own testimony that he did not regard his conduct to be wrongful. *See, e.g.*, *Certified Envtl. Servs., Inc.*, 753 F.3d at 90 (district court's exclusion of

3

good-faith evidence, including Department of Labor guidance, was improper); *see also Diallo*,

40 F.3d at 34 (reversing conviction where district court excluded expert testimony that would

have assisted the jury in determining the defendant's true state of mind); *Onumonu*, 967 F.2d at

788 (same).

The government advances the specious argument that by defining "front-running," Dr.

Overdahl's testimony "usurps the role of the Court, which has the responsibility of instructing

the jury on the elements of the crimes charged in the indictment." Gov't Mot. at 3. This

argument is belied by the government's acknowledgement that the crimes charged in the

indictment, and on which the Court will instruct the jury, are wire fraud and conspiracy – not

"front-running."[1] Dr. Overdahl's testimony about industry regulators' understanding of "front-

running" does not improperly invade the Court's role in instructing the jury on the applicable

law, but rather properly provides the jury with helpful context on concepts relevant to the

existence of a "scheme to defraud" and Mr. Johnson's intent and good faith. *See, e.g., Cary Oil*

*Co. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11,

2003) (Marrero, J.) (permitting law professor to testify as expert on concepts of corporate

governance and veil-piercing, and recognizing that trial courts have "latitude to allow experts to

testify about issues that would help the jury understand concepts it needed to know to render a

verdict despite the fact that the opinions may encroach on matters of law"); *Wilson*, 2016 WL

7229056, at *8; *see also Litvak*, 808 F.3d at 186 (district court exceeded its allowable discretion

---

[1] The government itself has emphasized this distinction in the past when convenient. For
example, the government moved *in limine* to preclude evidence of regulation of "front-running"
in the foreign exchange market, arguing that such regulation (or lack thereof) is irrelevant
because "the Indictment does not charge Johnson with violating any regulations; it alleges
criminal violations of the statutes prohibiting conspiracy and wire fraud." Gov't Mots. *in Limine*
(Aug. 4, 2017), ECF No. 85, at 11.

in precluding expert witness, who had served in various legal and compliance positions for broker-dealers and securities-industry regulators, from testifying about the arm's-length nature of the relationship between a broker-dealer and counterparty, which was relevant to prove that Mr. Litvak was not acting as an agent for the counterparties).

The government's argument that Dr. Overdahl's testimony defining "front-running" usurps the role of the Court is particularly shocking (and indefensible) because the *government's own* revised expert disclosure letter includes anticipated testimony of the *government's expert*, Dr. David DeRosa, purporting to provide *his own* definition of "front-running." Gov't Expert Disclosure (Aug. 10, 2017), ECF No. 87, at 1, 3 ("The government anticipates that Dr. DeRosa will provide the definitions of certain terminology commonly used in the foreign exchange market, including, in sum and substance and in part, the following terms and definitions: . . . Front-running: front-running refers to trading in advance of a client's transaction."). The government's apparent position that it has the exclusive right to provide expert testimony on this topic is untenable. As the Second Circuit has acknowledged, when it comes to expert testimony, "[t]urnabout is fair play, even in the federal courts." *Diallo*, 40 F.3d at 35.

The government's argument that Dr. Overdahl's testimony "misstates the law" is similarly misguided. Again, the government conflates Dr. Overdahl's testimony about the industry understanding of "front-running" with the legal concepts governing the charged crimes – specifically, the law regarding "criminal intent." Gov't Mot. at 4. Mr. Johnson does not dispute that "'[i]t is well established that a defendant accused of [a specific intent] crime may properly be convicted if his intent to commit the crime was one of his objectives.'" *Id.* (quoting *United States v. Technodyne, LLC*, 753 F.3d 368, 385 (2d Cir. 2014). This basic concept of law in no way conflicts with Dr. Overdahl's testimony about the industry regulators' understanding

5

of front-running; rather, it begs the question of whether Mr. Johnson knowingly and intentionally engaged in wrongdoing – the very topic on which Dr. Overdahl's testimony is relevant. Dr. Overdahl's testimony about industry regulators' understanding of what constituted improper "front-running" obviously is relevant to Mr. Johnson's state of mind. To the extent the government disagrees with Dr. Overdahl's testimony on this topic, it is free to cross-examine him on that basis.

To the extent the government complains that Dr. Overdahl's testimony "invites the jury to adjudicate guilt based on whether Johnson 'frontran' Cairn's order," Gov't Mot. at 3, the government's complaint is entirely a problem of its own making. By alleging that Mr. Johnson's conduct constituted a "scheme" that is "commonly referred to as 'front-running,'" the government placed squarely in dispute whether Mr. Johnson engaged in conduct understood to be a front-running scheme, and Mr. Johnson is entitled to defend himself. The government cannot taint Mr. Johnson by mislabeling his conduct a "front-running" "scheme," and suggesting that his conduct was well known to be improper, while precluding Mr. Johnson from presenting evidence to the contrary.

As for the government's suggestion that Dr. Overdahl's testimony improperly offers "opinions about the mental states of HSBC's traders," Gov't Mot. at 5, and about the "internal workings of the traders' psyches," id. at 6, the government misstates Mr. Johnson's disclosure, which suggests no such testimony. Rather, the defense disclosure summarizes Dr. Overdahl's entirely proper anticipated testimony that in his review of the trades labeled by the government as "front-running," Dr. Overdahl "does not find conduct consistent with the characteristics of front-running." Defense Expert Disclosure (Aug. 17, 2017), ECF No. 93, at 14. *See, e.g.,* *Wilson*, 2016 WL 7229056, at *8 ("Experts are not permitted to testify to an actor's state of

6

mind, but an expert can testify to whether a given practice is consistent with a given state of

mind."). This anticipated testimony is easily distinguished from the plaintiffs' expert testimony

excluded by the court in *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531

(S.D.N.Y. 2004) (Kaplan, J.), upon which the government relies. There, the Court explained that

"opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory

agencies and others have no basis in any relevant body of knowledge or expertise," and

explained the opinions as "musings as to defendants' motivations [that] would not be admissible

if given by any witness-lay or expert." *Id.* at 546 (internal quotation marks and footnotes

omitted). Dr. Overdahl's testimony, by contrast, properly draws on his relevant experience and

specialized knowledge and offers the jury helpful analysis that bears on the element of intent; it

does not include "musings" or speculation about parties' motivations, nor, as the government

suggests, "internal workings of traders' psyches."

With respect to Dr. Overdahl's anticipated testimony about manipulation, Mr. Johnson

agrees that testimony about manipulation has no place in this trial. As the Court is aware, Mr.

Johnson filed a motion *in limine* on August 4, 2017, seeking to preclude all references at trial to

"manipulation" of the foreign currency market, and moved on August 31, 2017 to preclude

testimony of government expert witness Dr. David DeRosa regarding manipulation of the

market. In his expert disclosure, Mr. Johnson explicitly stated that in the event the Court grants

his motion to preclude references to manipulation, the portion of Dr. Overdahl's testimony

addressing "manipulation" would be moot. Defense Expert Disclosure (Aug. 17, 2017), ECF

No. 93, at 1 n.1. To the extent the government is permitted to argue and present evidence that

Mr. Johnson participated in "manipulation," however, Mr. Johnson is entitled to present

evidence, including expert testimony, to the contrary. For the same reasons explained above

with respect to "front-running," Dr. Overdahl's anticipated testimony regarding manipulation is relevant and admissible.

### B. Mr. Rodgers' Testimony that the Price Paid by Cairn Was "Commercially Reasonable" Is Relevant and Admissible Expert Testimony.

The government next objects to the anticipated testimony of Kevin Rodgers that "the price paid by Cairn fell within a commercially reasonable range." Gov't Mot. at 6 (quoting Defense Expert Disclosure at 7). This anticipated testimony is based on Mr. Rodgers' "own extensive involvement in overseeing the execution of comparably sized fix orders in the same or similar currencies, as well as a comparison of the price Cairn received against other pricing benchmarks, including prices submitted to Cairn as part of the bidding process." Defense Expert Disclosure (Aug. 17, 2017), ECF No. 93, at 7.

The government argues that this portion of Mr. Rodgers' testimony should be precluded under Rule 403 because it will confuse the jury by suggesting a "no harm, no foul" defense that is in conflict with Second Circuit law. The government argues that "[s]o long as the government proves that Johnson intended to 'ramp' the price as part of a scheme to defraud Cairn (even if his efforts were unsuccessful), it makes no difference whether Cairn ultimately paid a 'commercially reasonable' price for Sterling." Gov't Mot. at 8.

The government's argument misapprehends the applicable law and the point of Mr. Rodgers' testimony. While the government is correct that a scheme to defraud need not be successful to be criminal, Mr. Rodgers' testimony that Cairn paid a commercially reasonable price is highly relevant to the questions of whether a scheme to defraud existed, whether Mr. Johnson had intent to defraud, and whether any alleged deception was material.

Under established Second Circuit precedent, a defendant lacks the requisite intent to defraud, and is not guilty of wire fraud in connection with a commercial transaction, if the

defendant intends to provide the alleged victim with the benefit of its bargain in the relevant transaction. *See, e.g.*, *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (concluding that defendant must have contemplated some actual harm or injury to the victim, and "[m]oreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970)); *see also United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (same).

Here, the Defense Expert Disclosure included the following anticipated testimony of Mr. Rodgers, to which the government does *not* object:

> He will testify that ***the duty of best execution, in the context of a fix order between principal counterparties, does not mean best price but rather means that the bank's execution seeks to be fair and reasonable under the circumstances***. Mr. Rodgers will testify that he had reviewed certain HSBC compliance policies for the FX department that relate to best execution, and that his understanding of the best execution obligation comports with the HSBC policies he has reviewed, which provides ***broad latitude for the bank to evaluate the reasonableness of the execution***.

> Mr. Rodgers will testify that it is understood that fix orders do not generally provide the lowest possible price; however, end users may nevertheless prefer to transact at a fix due to perceived transparency. He will also testify that the execution method most likely to yield the best price – namely, at-best orders – may be disfavored by some clients due to risk aversion.

Defense Expert Disclosure (Aug. 17, 2017), ECF No. 93, at 4. This evidence – the admissibility of which is obvious and undisputed – suggests that what Cairn bargained for was not "best price" but a ***reasonable*** execution. Accordingly, Mr. Rodgers' anticipated testimony that the price Cairn paid was "commercially reasonable" (based on, *inter alia*, "a comparison of the price Cairn received against other pricing benchmarks, including prices submitted to Cairn as part of

the bidding process") is relevant to the determination of whether Cairn was defrauded, or, alternatively, whether Cairn received the benefit of its bargain. *Id.* at 7.

Whether Cairn *actually* received the benefit of its bargain, in turn, is highly relevant to whether Mr. Johnson *intended* to provide Cairn with the benefit of its bargain – i.e., whether Mr. Johnson acted in good faith. *See, e.g.*, *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("While technically the success or failure of a scheme to defraud is irrelevant in a mail fraud case, realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." (citation omitted)). Indeed, where the alleged victim of a fraud has suffered loss, evidence of the loss is routinely admitted as evidence of intent to harm. *See, e.g.*, *Regent Office Supply Co.*, 421 F.2d at 1181 ("Of course proof that someone was actually victimized by the fraud is good evidence of the schemer's intent."). If the government had evidence that Cairn had *not* received a commercially reasonable rate, no doubt it would seek to admit such evidence.

The *absence* of any loss or harm in this case is equally probative of Mr. Johnson's good faith and lack of intent to defraud, and Mr. Johnson is entitled to present such evidence. *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) ("[S]ince [good faith] may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have." (citation omitted)); *Litvak*, 808 F.3d at 190 (same); *see also Diallo*, 40 F.3d at 34 (reversing conviction where district court excluded expert testimony that would have assisted the jury in determining the defendant's true state of mind); *Onumonu*, 967 F.2d at 788 (same).

Mr. Rodgers' testimony about the commercial reasonableness of the price paid by Cairn also is relevant and admissible as to the materiality of any alleged misrepresentations and omissions. *See, e.g.*, *United States v. Finazzo*, No. 10 Cr. 457 (RRM), 2013 WL 619571, at *5 (E.D.N.Y. Feb. 19, 2013) (Mauskopf, J.) (to be "material," "misrepresentation must go to an 'essential element of the bargain' and be 'directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain.'") (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (quoting *Regent Office Supply Co.*, 421 F.2d at 1179)).[2]

Moreover, the government has placed in issue the commercial reasonableness of the price paid by Cairn by making allegations about the amount of profit that HSBC made in connection with the Cairn transaction, and disclosing its intent to present expert testimony on that topic. Specifically, the Indictment alleges that "[i]n total, HSBC gained approximately $5,000,000 from its execution of the Victim Company FX Transaction and approximately $3,000,000 from the P-book trades of the London and New York FX traders." Indictment ¶ 35. Similarly, in its July 7, 2017 expert disclosure letter, the government disclosed anticipated testimony of one of its

---

[2] *Litvak* is not to the contrary. There, the government alleged that Mr. Litvak committed securities fraud by making misrepresentations to counterparties in the course of negotiations for the sale of securities at negotiated prices. On appeal, the Second Circuit concluded that the district court acted within its discretion in excluding expert testimony about the fair market value of the securities. 808 F.3d at 185-86. That aspect of the *Litvak* ruling, however, has no application here. First, Litvak was charged with *securities* fraud in violation of Section 10(b), and the Court concluded that, unlike the wire fraud statute at issue here, Section 10(b) does not require proof of intent to harm the victim, but only intent to *deceive*. *Id.* at 178. The fair market value of the securities was not relevant to Litvak's intent to *deceive*. *Id.* at 185-86. Second, in *Litvak*, the price of the securities was a "heavily negotiated term," *id.* at 176 (punctuation and citation omitted); thus the "fair market value" of the securities did not affect the materiality of the misrepresentations. *Id.* at 185-86. Here, in marked contrast, Mr. Rodgers' unchallenged anticipated testimony is that Cairn did *not* negotiate for "best price," nor did it choose the method ("at-best" orders) most likely to achieve the best price, but rather, it opted for an execution at a fix. *See* Defense Expert Disclosure (Aug. 17, 2017), ECF No. 93, at 4. Evidence that Cairn actually received exactly what it bargained for, and was not harmed by any alleged misrepresentation or omission, has obvious relevance and importance to Mr. Johnson's defense, particularly with respect to Mr. Johnson's good faith and lack of intent to harm Cairn.

experts, Ross Waller, about his calculations that HSBC made a profit of approximately $4.4 million in its London GBP/USD spot book around the 3 pm fix on December 7, 2011, and a total profit of approximately $3.1 million from Sterling-Dollar P-book trades of various traders on that same day. Gov't Expert Disclosure (July 7, 2017), ECF No. 70, at 2-3. The government's allegations and evidence that HSBC made several million dollars in profit from the transaction pose a risk of prejudice to Mr. Johnson by suggesting to the jury that HSBC made substantial profit by overcharging its customer. Mr. Johnson is entitled to rebut this allegation by presenting evidence that the price Cairn paid was commercially reasonable.

For these reasons, Mr. Rodgers' testimony that the price paid by Cairn was "commercially reasonable" is relevant and admissible.[3]

### C. Testimony About the Absence of Regulations Prohibiting Mr. Johnson's Conduct Is Highly Relevant and Proper.

The government next objects to Mr. Rodgers' testimony "'about the lack of formal regulation or guidance in December 2011 with respect to how large fix orders should be executed or hedged'" and his testimony that "'he is unaware of any regulation, guidance, or industry practice that would have prohibited the manner of execution employed by HSBC.'" Gov't Mot. at 8 (quoting Defense Expert Disclosure at 9).

This testimony – confirming that Mr. Johnson had no reason to believe that his pre-hedging conduct would later be deemed to be wrongful (let alone criminal) – goes to the heart of Mr. Johnson's good faith defense. As such, this testimony is not only relevant and admissible, but critical to Mr. Johnson's defense. Under established Second Circuit law, preclusion of this

---

[3] In a footnote, the government also objects to Mr. Rodgers' anticipated testimony that the trades in issue "were not harmful to Cairn." Gov't Mot. at 7 n.2. That testimony is relevant and admissible for the same reasons set forth above as to his testimony about commercial reasonableness.

evidence would deprive Mr. Johnson of a fair opportunity to present his defense to the jury. *See, e.g.*, *Diallo*, 40 F.3d at 34 (reversing conviction where district court excluded expert testimony that would have assisted the jury in determining the defendant's true state of mind); *Onumonu*, 967 F.2d at 788 (same); *Brandt*, 196 F.2d at 657 ("[N]o events or actions which bear even remotely on [good faith's] probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have." (citation omitted)); *Litvak*, 808 F.3d at 190 (same); *Certified Envtl. Servs., Inc.*, 753 F.3d at 96 (district court's improper exclusion of good-faith evidence left the jury "without vital context and corroboration for the defendants' defense of good faith and lack of criminal intent").

As the Court is aware, the government filed a motion *in limine* seeking to preclude evidence relating to regulations. In its September 1, 2017 Sealed Memorandum and Order on the parties' motions *in limine*, the Court denied the government's motion and ruled that evidence that Mr. Johnson's conduct was not prohibited, and was common business practice in the industry, is relevant evidence substantiating Mr. Johnson's good faith. Sealed Mem. & Order at 31. The government's motion to preclude Mr. Rodgers' expert testimony on this topic offers no basis for a different result here.

In this motion (as in its prior motion *in limine*), the government concedes that evidence regarding the existence and applicability of pertinent regulations is relevant "to the extent that it tends to show Johnson's state of mind in engaging in the charged conduct," but goes on to make the preposterous statement that "[e]xpert testimony about the existence or applicability of regulations, in the abstract, is irrelevant and potentially confusing to the jury." Gov't Mot. at 8. This argument fails for the same reasons explained by the Court in its September 1, 2017 Sealed Memorandum and Order. The government's continued attempt to limit Mr. Johnson's good-faith

13

evidence to his own testimony, should he choose to testify, and to preclude expert testimony

corroborating Mr. Johnson's defense, is improper, and contrary to established law. *See, e.g.,*

*Diallo,* 40 F.3d at 34; *Onumonu,* 967 F.2d at 788; *Brandt,* 196 F.2d at 657; *Litvak,* 808 F.3d at

190 (holding that trial court "exceeded its allowable discretion" in concluding that testimony that

supervisors at Jeffries regularly approved of conduct similar to defendant's was not relevant to

defendant's good faith); *Certified Envtl. Servs., Inc.,* 753 F.3d at 90.

Further, contrary to the government's argument that the testimony would be unfairly

confusing to jurors, expert testimony is routinely admitted to provide the jury with relevant

context and to show the defendant's knowledge (or lack of knowledge) of wrongdoing. *See,*

*e.g., United States v. Nouri,* 711 F.3d 129, 136 (2d Cir. 2013) (noting, in criminal case, that

"[s]everal regulatory and compliance officials testified at trial about the rules that apply to

stockbrokers"); *United States v. Ortiz,* 112 F.3d 506, at *5 (2d Cir. 1997) ("The expert in this

case, Special Agent Semesky of the IRS, testified on a broad range of subjects relevant to the

money laundering and structuring charges against Ortiz; he described, *inter alia,* the complex

statutory and regulatory requirements imposed by the currency transaction reporting laws . . . .").

Indeed, it is difficult to imagine how the jury could be confused by the relevant anticipated

testimony.

While the government may be correct that "legislators and regulators cannot foresee the

myriad and evolving ways in which people commit fraud," Gov't Mot. at 9, this statement is yet

another red herring.  It is fundamental that business people such as Mr. Johnson are entitled to

notice – *before being criminally prosecuted* – that their conduct is criminal.  The expert

testimony of Mr. Rodgers, confirming that Mr. Johnson's conduct was not prohibited by any law,

regulation, guidance, or industry practice, and in fact was consistent with standard industry

practice, is powerful and essential evidence supporting Mr. Johnson's good faith. While the government surely is correct that the testimony is prejudicial to its case, that prejudice is entirely proper.

**D. Mr. Rodgers' Testimony about the Possible Origins of a Rumor and the Use of Code Words in the Industry Is Relevant and Admissible.**

The government's next complaints relate to Mr. Rodgers' testimony regarding transactions with Russian counterparties and the use of code words in the industry.

1.   <u>Russian Counterparties</u>

The government objects to Mr. Rodgers' anticipated testimony that "his review of HSBC [trading data] indicates that Russian counterparties did transact with HSBC on December 7, 2011, prior to the time of the 3pm fix. He will testify that although this activity is unlikely to have had a material impact on GBPUSD prices, it is possible that the activity with Russian counterparties was the source of a rumor about Russian market activity on the day." Gov't Mot. at 10 (quoting Defense Expert Disclosure at 8) (emphasis omitted).

The relevance of this testimony relates to the allegations in the Indictment that (1) "just after 3:00 PM London time, Salesperson 1 told JOHNSON and SCOTT that he had told the Victim Company and its Advisor that a '[R]ussian name' was buying at the same time as the Victim Company," and "Accordingly, JOHNSON and SCOTT knew that the Victim Company and the Advisor had been falsely and fraudulently assured that the upward price movement in Sterling/Dollar was attributable to a '[R]ussian name,'" Indictment ¶ 30; and (2) that shortly after 3 PM, Mr. Johnson and Mr. Scott participated in a call with the Victim Company and the Advisor, in which Mr. Scott "falsely attributed to trading by a Russian bank" an initial jump in the price, when in fact "as SCOTT well knew, HSBC was responsible for the increase in the

15

price of Sterling/Dollar prior to the Victim Company FX Transaction, not a Russian bank," *Id*. ¶¶ 31-32.

Given the Indictment's allegations that the above representations were fraudulent, Mr. Johnson is entitled to present evidence supporting his good-faith belief that a Russian name was in fact active in the market (regardless of whether this belief turned out to be true).[4] *See, e.g., United States v. Hamilton*, 3 F. App'x 7, 10 (2d Cir. 2001) (recognizing that "[a]n honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be") (internal quotation marks and citation omitted). The relevant portion of Mr. Rodgers' testimony is probative of Mr. Johnson's good-faith belief about Russian purchases.

Far from speculative, the testimony draws on Mr. Rodgers' experience in the industry and his knowledge, based on that experience, that privately held Russian banks and Central Banks were active in FX markets and their trades were believed to have had price impacts on the market. He will further testify that trading information, including rumors, often circulates on trading floors, which is one way that rumors can start and spread among traders and other market participants. Mr. Rodgers' proposed testimony is appropriate and important expert testimony supporting both (1) the likelihood that such a rumor existed, and (2) the believability of the rumor. Furthermore, the government has disclosed that one of its proposed experts, Mr. Waller, will testify that he "reviewed the trading date for HSBC's London GBP/USD spot book and saw no indication . . . that a Russian bank, including the Russian Central Bank, bought cable from

---

[4] The government's motion papers misleadingly refer to "*Johnson's* and Scott's statements to the client about Russian bank trading," Gov't Mot. at 11 (emphasis added), and argue that "Johnson and Scott falsely attributed the increase to a large Sterling order that a Russian bank placed with HSBC," *id*. at 10. The Indictment, however, does not allege any such statement by Mr. Johnson. It simply alleges that Mr. Johnson participated in the call in which Mr. Scott made the relevant statements. Indictment ¶¶ 31-32.

HSBC on December 7, 2011 before the 3 pm fix." Gov't Expert Disclosure (July 7, 2017), ECF

No. 70, at 2. To the extent that Mr. Waller's testimony is offered to suggest that there was no

basis in fact for the alleged misrepresentation, Mr. Johnson is equally entitled to present Mr.

Rodgers' testimony as to documentary evidence and trading data that provides a plausible basis

for that alleged misrepresentation. *See Diallo*, 40 F.3d at 35 (noting that "[t]urnabout is fair play,

even in federal courts").

Accordingly, the testimony is relevant and admissible because it bears on Mr. Johnson's

good faith and his lack of knowledge that the alleged statements were false. *See, e.g.*, *id.* at 32-

35 (in prosecution for importing heroin with intent to distribute, where defendant's defense was

that he believed he was smuggling gold dust rather than heroin, district court committed

reversible error in excluding expert testimony of commodities consultant about the economic

motivation for swallowing gold dust, which would have been relevant to the jury in determining

the likelihood that defendant actually believed he was smuggling gold dust; "Without [the

expert's] testimony, Diallo had only his own testimony to support his defense: a stranger in a

strange land approached him and paid him to swallow condoms filled with gold dust."); 

*Onumonu*, 967 F.2d at 788 (reversing conviction based on district court's exclusion of expert

testimony of gemologist that bore on the likelihood that defendant actually believed he

swallowed diamonds rather than heroin).

### 2. Use of Code Words

The government also seeks to exclude Mr. Rodgers' testimony, based on his experience

at Deutsche Bank, about the use of "code words" in the foreign exchange industry to

communicate necessary information to traders while protecting confidentiality. Specifically, the

Defense Expert Disclosure states as follows:

> Mr. Rodgers will testify that, as a matter of general industry practice, code words were commonly used within FX departments as an information control protocol to designate to traders and sakes personnel that a sensitive order was in progress. Mr. Rodgers will testify that, at Deutsche, upon hearing the code word, traders were expected to "lock down" information about the deal and not discuss it with sales personnel.  Similarly, he will testify that salespeople who were told of the code word, knew that they should not enquire or speculate further, particularly with clients.  He will testify that the purpose of information control code words was to protect the client order information from leaking into the market, to the disadvantage of both the client and the bank.

Defense Expert Disclosure (Aug. 17, 2017), ECF No. 93, at 9.

The government acknowledges in its motion papers that "[t]he concept of code words is important in this case because the government will offer evidence that Johnson disguised the fact that he tipped other HSBC traders about Cairn's impending order by speaking in code."  Gov't Mot. at 10.  The relevant portion of Mr. Rodgers' testimony, which draws on Mr. Rodgers' industry experience and expertise, provides vital evidence that use of "code words" in connection with a transaction were not inherently nefarious, but rather served a legitimate purpose in the industry in protecting confidentiality.  Because this expert testimony bears on the believability of Mr. Johnson's defense that his use of code words was innocent and intended to convey necessary information while preserving confidentiality, rather than to improperly "tip" traders, the evidence is probative and admissible.  *See, e.g.*, *Diallo*, 40 F.3d at 32-35; *Onumonu*, 967 F.2d at 788.

The government's argument that the testimony should be excluded because it addresses the use of code words at Deutsche Bank, rather than Johnson's use of code words at HSBC, is meritless.  The purpose of expert testimony is to provide the jury with context and information outside its ken – here, relevant practices and concepts within the foreign exchange market – *not* to provide eyewitness testimony about the events alleged in the Indictment.  Mr. Rodgers' anticipated testimony about the use of code words in the industry plainly is helpful to the jury in providing relevant industry information and context for Mr. Johnson's conduct that affects the

18

credibility of his defense.  Indeed, this testimony is particularly probative and helpful to the jury in assessing Mr. Johnson's intent in using code words because Mr. Rodgers will testify that the use of code words at Deutsche Bank to protect client confidentiality was instituted during the time that Mr. Johnson also was employed at Deutsche Bank.

Further, the government misstates the anticipated testimony, arguing that "Rodgers lacks any basis to testify about what salespeople at HSBC understood certain words to mean."  Gov't Mot. at 11.  The Defense Expert Disclosure suggests no such thing; the relevant anticipated testimony explains relevant industry practice, based on Mr. Rodgers' experience and expertise. It does not purport to address the thoughts or understanding of salespeople at HSBC; it is Mr. Johnson's knowledge and intent that is at issue, not the understanding of others at HSBC.[5]

The government's motion to preclude the anticipated testimony is baseless and should be denied.

### E.  Mr. Rodgers' Testimony about FX Desks Is Relevant and Admissible.

Finally, the government objects to the anticipated testimony of Mr. Rodgers about the structure of FX desks, the typical job responsibilities of managers within an FX department, the trading environment of an FX spot desk, "and the limited real-time information available to trading and other personnel." Gov't Mot. at 12 (quoting Defense Expert Disclosure at 3).  The disputed testimony, which is based on Mr. Rodgers' industry experience and expertise, constitutes perfectly permissible expert testimony that serves as relevant background for Mr.

---

[5] Throughout its motion papers, the government repeatedly relies on one sentence from one case: "[T]he opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in the relevant body of knowledge." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp. 2d 531, 546 (S.D.N.Y. 2004). *See* Gov't Mot. at 5, 11.  The government's reliance on this sentence is misplaced because Mr. Johnson's expert witnesses do not purport to offer any such testimony.  Rather, the experts offer entirely proper expert testimony, based on their industry knowledge and experience, that is *relevant* to the jury's determinations regarding intent.

Rodgers' analysis of the relevant principles and the transaction. The anticipated testimony about the trading environment of an FX spot desk and "the limited real-time information available to trading and other personnel" provides particularly relevant and important context bearing on Mr. Johnson's knowledge in connection with the transaction.

The government's argument that this testimony is irrelevant because it addresses the way a "typical" FX desk works rather than specifically the way HSBC's FX desk operated, once again, misapprehends the distinction between testimony of expert witnesses and percipient witnesses. Mr. Rodgers will testify that the "limited real time information" available to market participants is a function not only of a bank's internal structure but also of the decentralized structure of the FX interbank market, which operates through multiple trading venues, thereby reducing the information available to traders and other personnel about trades other than a bank's own client flow. Accordingly, Mr. Rodgers' testimony appropriately provides the jury with background information that will permit the jury to evaluate the relevant issues and evidence in the context of the FX industry as a whole. *See United States v. Herron*, No. 10 Cr. 0615 (NGG), 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014) (Garaufis, J.) (noting that the Second Circuit's standard for admissibility of expert testimony is "especially broad," that the "rejection of expert testimony is the exception rather than the rule, and "the court starts with the assumption that a well-qualified expert's testimony is admissible" (internal quotation marks and citations omitted)).

The government's argument also contradicts its own disclosure for Dr. DeRosa, whose proposed testimony will provide general background information about practices in the FX market, without specific reference to HSBC's practices or the Cairn transaction. Gov't Expert Disclosure (Aug. 10, 2017), ECF No. 87, at 1-4. *See Diallo*, 40 F.3d at 35.

The challenged testimony of Mr. Rodgers, like all of the other expert testimony that the government seeks to exclude, constitutes relevant and permissible expert testimony in support of Mr. Johnson's defense.

## CONCLUSION

For these reasons, the government's motion preclude categories of expert testimony should be denied.

Dated:  September 6, 2017
        New York, NY

Respectfully submitted,

LANKLER SIFFERT & WOHL LLP

By: _____
       Frank H. Wohl

500 Fifth Avenue, 34th Floor
New York, NY 10110-3398
(212) 921-8399
*Attorneys for Mark Johnson*

21